**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI – CENTRAL DIVISION**

| | | |
|---|---|---|
| **Carla Niekamp** | ] | |
| **Plaintiff** | ] | |
| | ] | |
| **v.** | ] | |
| | ] | **Jury Trial Demanded:** |
| **State of Missouri** | ] | |
| **Department of Labor and Industrial** | ] | |
| **Relations** | ] | |
| **Division of Employment Security** | ] | |
| **Defendants** | ] | |

**PLAINTIFF'S COMPLAINT FOR DISCRIMINATION BASED UPON SEX IN VIOLATION OF TITLE VII 42 USC 2000(e) ET SEQ INCLUDING CLAIMS FOR EQUAL PAY, RETALIATION, HOSTILE WORK ENVIRONMENT AND ASSOCIATED DISCRIMINATION VERSUS THE DEFENDANTS: THE STATE OF MISSOURI, DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS (DOLIR) AND THE DIVISION OF EMPLOYMENT SECURITY (DES)**

**PRELIMINARY STATEMENT**

Plaintiff files her complaint alleging violations of various Federal Anti-Discrimination in Employment Statutes committed by her employer, the State of Missouri through the employees of the Department of Labor and Industrial Relations (DOLIR) and the Division of Employment Security (DES). All in violation of Title VII 42 USC 2000(e) et. seq. and conferring subject matter jurisdiction on this Court as a Federal question. In support of her claims, Plaintiff states:

**JURISDICTIONAL STATEMENT**

1. Plaintiff is a United States citizen and a resident of the State of Missouri ("State") who is covered and afforded the protections under the US Statutes prohibiting workers, like Plaintiff, from employment discrimination including: equal pay violations; gender discrimination against women in their terms and conditions of employment including equal pay and hostile work environment; retaliation for filing complaints about such

discrimination and pursuing her rights under the applicable State and Federal Statutes as well as for discrimination for associating with others in the work place who have sustained same and similar discriminatory conduct including hostile work environment and denial of employment based on gender and or race.

2.     Plaintiff was employed by the Defendant State of Missouri, DOLIR and DES with her offices located in Jefferson City, Cole County, Missouri.  Plaintiff was a full time employee and is female.

3.     The acts of discrimination took place in the State of Missouri, mostly taking place in Cole County, which is located within the Central Division of the Western District.  Employees of the Defendant employer who acted in a discriminatory fashion are all mostly located in Cole County with one located in the City of St. Louis.

4.     The employer is located and does business throughout the State of Missouri with its head office located in Cole County.  The Defendants are State Agency's subject to the above Federal Anti-Discrimination in Employment Statutes.  They act through their various Administrators, Managers and employees.

5.     As such the proper venue for this Complaint is the Western District of Missouri, Central Division.

6.     Plaintiff's claims give rise to a Federal question and Federal question subject matter jurisdiction under 28 USC §1331.

**Facts Giving Rise To Plaintiffs Claims And Causes Stated Under Both Federal Law And Missouri Law.**

7.     The Defendant State of Missouri through its Department of Labor and Industrial Relations (DOLIR) and its Division of Employment Security (DES) all constitute Plaintiff's employer.  She was employed on/about October 2015 and continued full time

2

employment up until October 31, 2018 when she was Constructively Discharged due to Defendants' repeated and ongoing discriminatory acts against her.

8. Plaintiff began her employment with the Defendants'' DES Criminal Investigative Unit (CIU) in October 2015 as an "Investigator III" and worked continuously in that position until she was constructively discharged on October 31, 2018.

9. Plaintiff initially filed a charge of discrimination with the Missouri Commission on Human Rights and dually filed with the EEOC on April 25, 2018, EEOC case No. 28E-2018-00906C. In that charge, Plaintiff claimed the Defendants through their employees discriminated against her based upon her sex and gender with respect to her compensations in violations of the Federal Equal Pay Act, Title VII, 42 USC 2000(e), by paying her less annual income than her male predecessor, male contemporaries, and her male subordinates. Plaintiff attaches her complaint filed with the MCHR/EEOC as Exhibit A.

10. Plaintiff also filed a Complaint with the MCHR/EEOC on June 23, 2019. That Complaint is attached and identified as Exhibit C. That Complaint was filed within 300 days of Plaintiff's Constructive Discharge of October 31, 2018. EEOC issued its Right to Sue letter on February 6, 2020; the 90th day would be May 6, 2020. Plaintiff files her Complaint within that 90 day period.

11. Plaintiff states within her June 23, 2019 complaint, that the Defendant began to continuously retaliate against her due to her internal complaints about wage discrimination as well as discriminating against other female employees of the section that would constitute "me too" employees. Plaintiff asserted in her Complaint that she

was being subjected to retaliation for her association with other "me too" employees being subjected to sex discrimination.

12. Plaintiff further asserted in her 6/23/19 complaint that the condition of her employment based upon the original acts of inequitable pay based upon sex, retaliation for asserting an internal complaint about such inequitable pay as well as Defendants' actions taken with regard to the discriminatory treatment of a fellow employee(associational discrimination), created such a hostile work environment and adverse working conditions that Plaintiff submitted her resignation, a Constructive Discharge, on October 31, 2018.

13. Plaintiff was subjected to retaliation by Defendants after she filed her internal complaint of equal pay discrimination and after her 4/25/18 MCHR complaint. Such adverse conditions of her employment and the retaliations against her resulted in her working conditions being so intolerable that by October 31, 2018 she was forced to resign, a Constructive Discharge.

14. Defendants' acts of retaliation were for Plaintiff exercising her rights under Chapter 213 RSMo and under Title VII 42 USC 2000(e) to file a complaint of discrimination as well as her rights to file an internal complaint with regard to Defendants' discriminatory conduct regarding her pay inequity that was based upon her sex.

15. Plaintiff was also retaliated against for her actions as a supervisor in support of fellow "me too" employee, Amira Suljic, who had been discriminated against due to her sex and specifically denied employment and subjected to adverse working conditions that were hostile and created by a male co-employee and where Suljic's superiors and Plaintiff Niekamp's superiors refused to take any action to alleviate the adverse and hostile working conditions for Suljic. This, even when those Superiors, knew of such

discriminatory conduct well enough in time to correct and end such discriminatory conduct.

16. The actions taken by both Ms. Suljic's and Plaintiff's supervisors against both Ms. Suljic and Plaintiff were so discriminatory and hostile that they created such an adverse working condition for Suljic, that Plaintiff, as Suljic's supervisor, in turn went to Plaintiff's own supervisors and pointed out the facts of the discrimination that were being taken against Suljic in the work place and caused by a co-employee. Such co-employee's conduct was violative of not only Anti-Discrimination laws based upon Suljic and the Plaintiffs gender but were also violative of DOLIR and DES Code of Conduct. Plaintiffs conduct is commonly referred to as "associational" and the Defendants conduct is commonly referred to under both Missouri law and Federal law as "associational discrimination". The motivating factor for such discrimination was Suljic's gender, being a female.

17. Defendant, through its supervisory and administrative staff, refused to take any action to stop the hostile environment created against Ms. Suljic and particularly failed to take any action after Plaintiff Niekamp brought such conduct to the attention of the Defendants' Administrative and Supervisory staff. In fact, at some point, the Defendants instead of dealing with the situation, simply fired Suljic, the one being discriminated against versus taking any action against the perpetrator. Plaintiff, because of her association with Suljic, was also retaliated against by her Supervisors who then created a retaliatory and hostile working condition, such that it became so egregious that Plaintiff was forced to resign from her employment based upon such hostile environment, the "associational

5

discrimination" and the refusal of the Defendants to address and rectify Plaintiff's pay inequity.

18. The Defendants acts of discrimination against Plaintiff by creating an inequitable pay scale were motivated by Plaintiff's sex, being female. Defendants' acts of causing, creating and refusing to address a hostile and adverse working condition for Plaitiff were also motivated by Plaintiff being a woman.

19. The hostile and adverse working conditions of Amira Suljic were caused, created by and motivated by her sex. Those conditions were not addressed by the Defendants even though they had ample notice to take such corrective action. Therefore Suljic's sex was a motivating factor in both the creation of her hostile and adverse working conditions but Defendants refusal to rectify and address such adverse and hostile working conditions were also motivated by Suljic's gender. Suljic is a "me too" employee per the holding of Cox v Kansas City Chiefs.

20. Plaintiff received her EEOC "right to sue" letter dated February 6, 2020. It is attached as "Exhibit B". It was issued for her MCHR/EEOC complaint filed on 4/25/18. Plaintiff files this lawsuit after exhausting all of her administrative remedies and files this lawsuit in timely fashion within 180 days after the right to sue letter was issued by the EEOC. The MCHR and the EEOC have yet to issue a Right to Sue letter on Plaintiffs 6/23/19 dually filed complaint.

21. Because Plaintiffs working conditions had deteriorated so much, her complaints about ongoing wage disparity and discrimination had not been addressed and because she had sustained retaliation for asserting such claims of inequitable pay and because she was asserting and trying to protect the rights of a fellow employee subjected to sex

discrimination, Plaintiff's work conditions became so adverse and hostile that a reasonable person would have submitted their resignation. As such, Plaintiff was Constructively Discharged by Defendants on October 31, 2018. Plaintiff's sex, being a female, was a motivating factor for Plaintiffs Constructive Discharge. Plaintiffs association with Amira Suljic was another motivating factor in Defendants conduct or misconduct taken against the Plaintiff in the work place. The acts of discrimination taken against Suljic were also motivated by Suljic's sex, being female.

**Facts Supporting Plaintiff's Claims Of Wage Discrimination Based Upon Sex; Retaliation For Asserting Her Claims Of Wage Discrimination And Inequitable Pay Based On Sex; Plaintiffs Claim Of Discrimination For Associating With A Fellow Employee Subject To Sex Discrimination**

22.     Plaintiff was experienced in Law Enforcement and particularly as a Investigator, having worked for the Jefferson City Police Department for nearly 18 years. She applied for the position of Investigator III within the Criminal Investigation Unit within the Division of Employment Security (CIU). She was hired into that position in October 2015 and successfully completed her probationary period and was appointed to the full time Merit position of Investigator III at an annual salary of $40,173.00. The position had become open due to Mike Kauflin leaving that position. Mr. Kauflin had no law enforcement experience when he was hired into that position. His salary at the time of leaving that position was $45,203.00. More than $5,000.00 greater than what Plaintiff was paid. At no time had the Defendants disclosed to Plaintiff, Mr. Kauflin's current salary or salary history.

23.     On the date Plaintiff was hired, Plaintiff's immediate supervisor was Ryan Hickey, who supervised the DES "Criminal Investigative Unit" ("CIU"), the "Garnishment Unit" and

the "Adjudication Unit."  Candace Williams was the "Chief" of the CIU, Spencer Clark was the Assistant Director of the DES, and Chris Slinkard was the Director of the DES.

24.    When Plaintiff was hired into her Investigator III position in October 2015, as part of her duties she was to supervise at least 5 and possibly 6 subordinate employees.  Wesley Shavers and Ken Smith, both Investigators II.  They were located in the Jefferson City units; Zach Jenkins and Tim Smith, also Investigators II, located in the Kansas City Field Office; and Kevin Moore, an Investigator II assigned to the St. Louis Field Office.

25.    Plaintiff was hired to replace Mike Kauflin, a male, who held the position as Investigator III and who supervised the "CIU". Mr. Kauflin had no law enforcement experience when he was hired for his position.

26.    Before Plaintiff was hired to replace Mike Kauflin, and assume his job duties, Plaintiff had been employed by the Jefferson City Police Department for eighteen years and had acquired substantial experience in the field of law enforcement.  Her duties for the JCPD included field investigations, knowledge and application of the law, interviewing and interrogating witnesses, testifying in court, and included the supervision of others - all of which qualified her for the position as an Investigator III and as a replacement for Mike Kauflin.

27.    On the date of his departure of his position, Kauflin was being paid an annual salary of $45,203.  Plaintiff's starting annual salary was $40,173.00 and remained the same until she left the employment of the State on October 31, 2018.

28.    The principle objective of the Criminal Investigation Unit was to collect money from recipients of unemployment compensation who had, or who were suspected of filing fraudulent claims, received payments to which they were not otherwise entitled, or

8

received overpayments of benefits. The task of the CIU was to review garnishment letters provided to the Unit from the DES Garnishment Unit; contact the garnishee, and conduct a person-to-person interview to investigate the basis of the claims stated in the garnishment letters, field defenses, if any, from the garnishee, explain the collection process to the garnishee, explain the difference between civil and criminal actions which may arise from the garnishment, and, to make arrangements for the repayment of the overpayments.

29. Plaintiff's job duties as an Investigator III for the "investigative unit" included supervisory management and administrative duties, including hiring and training subordinate investigators, each who held the position as an Investigator II; training the subordinates on investigative and interrogation techniques; interrogating benefit recipients in the field; writing monthly reports which identified potential fraud cases; and, tracking and reporting the totals for the amount of recoveries obtained by the unit. The job also required drafting probable cause statements for County Prosecutors who were the enforcement arm of the Criminal Investigative Unit and, when required, testify in Circuit Court actions. The position required travel to the respective locations where the recipients resided to conduct interrogations, and in some instances, due to distance, travel times, and the time when a recipient was available for an interview, Plaintiff would be required to stay overnight in public accommodations.

30. As part of her job duties, Plaintiff was to supervise subordinates, prepare evaluations of subordinates, discipline subordinates when necessary, prepare and recommend performance improvement plans (PIP) for subordinates as well as make recommendations for discharges.

31. Plaintiff's job duties required her to attend regular or impromptu supervisor's meetings on a variety of issues affecting her unit.

32. DOLIR employed other individuals during Plaintiffs period of employment within the CIU who also would have been in the positions of Investigator III. Those individuals were:

> Dwayne Hickey

> Charles Crandal

> Steven Dodsen

> Dwight Miller

They were employees who worked for the Division of Worker's Compensation. One of the important duties assigned to Plaintiff with regard to Administrative and Supervisory positions was to be responsible for and intricately involved in the hireing of Merit position employees and ultimately recommending hire of employees who were hired into full time but probationary positions. That recommendation being with regard to hiring or not hiring such probationary employees. The general rule at DES has been traditional that when a supervisor made a recommendation for a probationary Merit system employee to be hired full time and as long as that position was fully funded, such recommendation would be followed and that probationary employee hired into a full time permanent position (not on probation).

33. Plaintiff was the only female Investigator III who was employed by the Division of Employment Security during her entire period of employment.

34. The main office of the CIU was located in Jefferson City, Missouri where Plaintiff was stationed. The Jefferson City unit was staffed with two male individuals: Wesley Shavers

and Ken Smith, who held the position of Investigator II. The unit had two field offices; one located in Kansas City, Missouri, the other in St. Louis County, Missouri. The Kansas City field office was staffed with two male individuals: Zach Jenkins and Tim Smith. The St. Louis field office was staffed with one male individual: Kevin Moore who held the position of "Investigator II." At that time, the Division was short one full time employee assigned to the St. Louis office.

35.  During her entire three year-period of employment, Plaintiff's annual salary remained at her starting annual salary of $40,173.00. This annual salary was substantially less than her predecessor, who was less experienced than Plaintiff; and, less than the male employees who held positions as Investigator III, and even less than the subordinate males who held Investigator II positions. The chart in paragraph 22 below illustrates the differences between Plaintiff's annual compensation and the compensation of her predecessor, contemporaries and subordinates. The following chart shows all the individuals in the CIU, their gender and annual salary at the time Plaintiff was hired:

| NAME OF EMPLOYEE | POSITION HELD | GENDER | ANNUAL SALARY |
|---|---|---|---|
| Carla Niekamp | Investigator III | Female | $40,173.00 |
| Mike Kauflin | Investigator III | Male | $45,325.00 |
| Dwight Miller | Investigator III | Male | $46,056.00 |
| Dwayne Hickey | Investigator III | Male | $45,137.00 |
| Steven Dodson | Investigator III | Male | $45,868.00 |
| Tim Smith | Investigator II | Male | $46,992.00 |
| Zach Jenkins | Investigator II | Male | $42,325.00 |
| Kevin Moore | Investigator II | Male | $41,184.00 |

| Richard Miller | Investigator II | Male | $41,184.00 |
|---|---|---|---|

36.     Plaintiff was unaware of the disparity in annual income until she discovered the fact in March, 2018. Upon receiving this knowledge, Plaintiff complained to EEO representative, Andrea Follett, on two occasions. Follett said she knew nothing about Plaintiff's concerns, but would "check on it." However, even after documenting her request for information about the disparity to Follett, Plaintiff did not get a response of any kind either from Follett or anyone else.

37.     Receiving no response from the EEO or any other administrator of DES or DOLIR, Plaintiff filed an internal complaint about wage inequity due to her sex, female, and the discriminatory nature of such wage inequity and provided the information that is contained within the chart described in paragraph 35 above. Having received no response from any of the Defendants or their Administrators and her pay inequity not being addressed, Plaintiff filed a MCHR/EEOC complaint on 4/25/18 complaining of wage discrimination and wage inequity based upon her sex. After Plaintiff filed her internal complaint and particularly after filing her MCHR/EEOC complaint on 4/25/18, Defendants continually engaged in intentional and systematic acts of harassment and retaliation against the Plaintiff as well as against co-employee Amira Suljic. Plaintiff pleads the specifics of those facts more specifically below. As stated above, Plaintiff on October 31, 2018, because of the terms and conditions of her work had become so abhorrent, submitted her resignation - a Constructive Discharge. Based upon the acts as described herein of the Defendants taken against the Plaintiff, a reasonable person would have resigned from such employment, such resignation constitutes a Constructive Discharge. That Constructive Discharge is based upon Plaintiffs gender or sex being a

motivating factor in the Defendants conduct resulting in Plaintiffs Constructive Discharge. Plaintiff's gender or se was the motivating factor in the Defendants conduct resulting in Plaintiff's Constructive Discharge. Plaintiff's gender was the motivating factor for the retaliatory actions taken against her by Defendants after she filed the above internal complaint and her MCHR/EEOC complaint. Plaintiff's sex was the motivating factor in Defendants retaliation against the Plaintiff.

38.     The retaliation by the Defendants through Plaintiff's supervisory employees, was due in part to her association with "Me too" employee Amira Suljic and the discriminatory acts that were being taken against Suljic due to her gender or sex. Defendants were motivated by Plaintiffs sex and "me too" employee Amira Suljic's sex for the manner in which they were adversely treated in their positions of employment with the Defendants.

39.     Defendants did not respond to Plaintiffs information provided to the EEO officer on two occasions nor did they respond to Plaintiffs internal complaint of pay inequity and pay discrimination. Defendants did however begin a systematic and intentional pattern of harassment and retaliation against Plaintiff, as described herein. As stated above Plaintiff because of the failure of the Defendants to even respond to her internal complaints and providing all of the information that she did to the EEO officer showing the inequitable pay or pay inequity based upon her gender, Plaintiff found no other alternative than to file her MCHR/EEOC complaint on 4/25/18. She asserted in that complaint a claim for pay inequity based upon her sex. As stated above that MCHR/EEOC complaint is attached as Exhibit A and the Right to Sue letter from the EEOC issued on February 6, 2020 is attached as Exhibit B.

**Acts Taken Against "ME TOO" Employee Amira Suljic**

40.   An opening existed in the CIU St. Louis Field Office for an Investigator II in the year 2017.   That office had only one other Investigator II, Kevin Moore.   Both positions reported directly to the Plaintiff.

41.   In order to fill that Merit system position of Investigator II, the HR Division of the Defendant DOLIR appointed Amira Suljic.   Suljic is a white female. On November 13, 2017 Plaintiff recommended the Defendants hire Amira Suljic, a white female, for the position of Investigator II.

42.   Suljic, classified as a "probationary employee" and assigned to fill the opening in the St. Louis field office where Suljic would work with Kevin Moore.

43.   Plaintiff assigned Kevin Moore, the other Investigator II in the St. Louis Office, to train Suljic.

44.   After Suljic reported to the St. Louis field office, Moore, Plaintiff's subordinate, refused her directive to train Suljic.   Moore indicated he did not like working with women and would not train Suljic.   Moore's acts were clear acts of discrimination based on sex committed against co-employee Suljic and his supervising officer, Plaintiff Niekamp.

45.   The failure of Moore to train Suljic, also included his failing to advise her of the availability and use of the vehicle provided to the St. Louis field office; which often led to Suljic having no access to keys to the vehicle or use of the vehicle.

46.   Moore expressed to Suljic a negative attitude toward Plaintiff, lamenting that a male who had applied for the position did not get the job.   He expressly stated to Suljic that he, Moore, didn't like working with women, or being supervised by them.   Again, acts of discrimination based upon both Suljic's and Plaintiff's sex.   Moore's acts and statements

constitute direct evidence of sex discrimination committed by him in the work place against both Plaintiff and co-employee Suljic.

47. Additionally, Suljic reported to Plaintiff, what had been reported by others, that she, Suljic had observed Moore being overly aggressive in his field office interviews of benefit recipients even infringing upon the recipient's civil rights. Similar complaints regarding Moore's overly aggressive interview techniques had been reported prior to Suljic being hired.

48. Once Suljic was hired into her position as an Investigator II and Plaintiff had directed Moore to train Suljic, Moore refused to answer Suljics questions about procedures and would intentionally not show up for work in order to avoid training Suljic. When he did show up for work Moore was disrespectful, dismissive and uncooperative with Suljic.

Moore's insubordination also included his intentionally trashing the State vehicle leaving trash, garbage and other items in the car knowing that Suljic would be using the vehicle. Moore went so far as to photograph the condition of the State vehicle and placed such photographs on his desk in view of Suljic knowing that it would offend and harass her.

49. Plaintiff, following the proper chain of command, reported Moore's misconduct and insubordination to her Chief, Candace Williams. This included that Moore refused to train Suljic. Other Supervisors besides Williams had in fact been informed of Moore's conduct. They included Mr. Hickey.

As some point, Moore had been sent "employee performance logs" with regard to his misconduct and poor job performance. Moore did not stop his conduct nor did he stop his blatant mistreatment of Ms. Suljic. Moore's conduct warranted a "performance

improvement plan" (PIP). However, no action was taken against Moore and his conduct then further deteroiated. Neither Hickey, Williams or Clark took any corrective action with regard to Moore's conduct.

50.    After Plaintiff communicated Suljic's complaints regarding Moore to her Chief, Candace Williams, including the fact that Moore refused Plaintiff's instructions to train Suljic Plaintiff received on January 4, 2018 an email from Ryan Hickey advising that Deputy Director, Spencer Clark had advised Hickey that he, Clark, expected Plaintiff to train Suljic and to address Moore's unacceptable interviewing skills ordering Plaintiff to fix these issues in four days.

51.    Plaintiff considered Clark's order arbitrary and unreasonable, considering that prior to January 4, 2018, the Defendants through Hickey, Clark and Williams had been told of Moore's poor job performance and various emails including "Employee Performance Logs" were sent to Mr. Moore with regard to his misconduct and poor job performance but despite such actions he did not improve his quantity and quality of work or his retaliatory behavior against Suljic and Plaintiff Niekamp.

52.    After Plaintiff discussed Moore's unacceptable job performance with Hickey and Williams, Plaintiff was initially instructed to begin documentation to reprimand and place Mr. Moore on a "PIP" (performance improvement plan). However, on February 26, 2018, Plaintiff was then instructed to "hold off" issuing the PIP or writing Mr. Moore up for his behavior and poor job performance. There was no legitimate reason to delay any type of job action against Moore including reprimanding him and placing him on a PIP.

53.    Because no action was taken against Moore, his conduct further deteriorated in terms of his discriminatory conduct against Plaintiff and Ms. Suljic. A meeting was called by the

Defendants for March 22, 2018 to address the discriminatory conduct of Moore against Plaintiff and Suljic. In attendance were Moore, Suljic, the Plaintiff, Williams, Hickey, Slinkard, Clark and Follett, the EEO officer. Among the topics discussed were reminders of the Code of Conduct, Section 4(b) related to the chain of command. The Defendants through the statements of Williams, Hickey and Clark informed Moore that under the unit's chain of command, Plaintiff was his boss. Moore assured everyone in attendance, including Hickey, Williams and Clark that he, Moore, understood Code of Conduct, Section 6, as related to respect, concern, positive attitude and open communications with fellow employees including co-workers, subordinates and superiors. Moore pledged, to everyone in attendance, that he would practice those objectives and comply with the Code of Conduct regarding his job performance and his working relationship with Suljic and with Plaintiff.

54.    However, Moore's behavior improved for only a few days after this March 22, 2018 meeting. In fact Moore's actions escalated into more offensive behavior toward Suljic. Specifically Moore refused to talk to Suljic and refused to respond to her emails. Moore posted the photographs described above of his trashing of the State vehicle and did so by placing those photographs on his desk in plain sight of Suljic. He knew that Suljic was offended by the condition of the vehicle and that such photographs reminded her of the actions taken by Moore that directly and adversely affected the condition of Suljic's workplace.

55.    Sometime by the end of March, 2018, as depicted in ¶35 above, Plaintiff learned of the fact that she was being compensated less than subordinate males in Investigator II positions, as well as other males holding her same classification of Investigator III.

Plaintiff, understanding the internal process, believed that it was the duty of Follett, the EEO, to advise Plaintiff's superiors, including Williams, Hickey, Clark, and those above them of Plaintiff's evidence of unequal pay and that by the very nature of that evidence that clearly indicated the pay inequity and that it was based upon Plaintiff being a female. Such establishing that Plaintiff's gender or sex was the motivating factor for the unequal pay.

56. Having received no response or corrective action after the Plaintiff informed the EEO officer and filed her internal complaint about unequal pay based upon gender or her sex, Plaintiff on April 25, 2018 filed her MCHR/EEOC complaint regarding equal pay discrimination based upon her sex. This was approximately 5 weeks after the earlier meeting, regarding the conduct of Mr. Moore, described above.

57. On April 25, 2018 Plaintiff, was also performing her job duties in the St. Louis Office and observed the job performances of both Suljic and Moore. Included in her work was Plaintiff accompanying Ms. Suljic on her normal work routine. Suljic reported that Moore had stopped communicating with her either directly or through email within one week after the March 22, 2018 meeting. Suljic also reported the offensive photographs that Moore placed in his work space that were then observed by Suljic and that Moore would have known that Suljic would have seen such photographs and been upset by the content of those photographs.

58. On April 25, 2018, after being in St. Louis and making her observations, Plaintiff immediately reported to her immediate supervisor Hickey what she had observed regarding Suljic and Moore. She reported Moore had stopped talking to Suljic a week

after the March 22, 2018 meeting, had posted offensive photographs in his work space which he knew would upset Suljic.

59.     Plaintiff also reported to Hickey that while she accompanied Suljic out into the field, that Suljic's performance was excellent including closing eight cases while on that field trip with Plaintiff.

60.     By May the acts of the Defendants of retaliating against Plaintiff increased.  For example, Plaintiff forwarded requests from another Investigator II for permission to work pending cases outside his office which would require travel.  In response to a request to Hickey, it was Clark who responded questioning whether it was necessary for Investigator II employees to go into the field.  Plaintiff responded to Clark by forwarding Chapter 10 of the "Presentation of Evidence" which provided a need for a face to face interview with subjects being investigated.  Plaintiff was then advised that any requests for travel in the field needed to be presented to Clark and approved by him, and not Hickey.  This was inconsistent with the process to be used by Investigator II and was very cumbersome and non-productive.

61.     Prior to May 10, 2018, Plaintiff had prepared and completed a form which indicated that Suljic had successfully completed her "probationary" period; nothing in the form prepared by Plaintiff reflected negatively on Suljic.  Plaintiff turned in the report to Williams as she was required to do so.  However, Plaintiff never received information from Williams or any of her other Superiors, that the form regarding Ms. Suljic had either been approved or disapproved.  Standard Operating Procedures was that if the immediate supervisor recommending the full time hire, the probationary employee would in fact be

hired.  Ms. Suljic was an exceptionally good employee and certainly far better than the lazy recalcitrant Kevin Moore.

62.   On May 10, 2018, Plaintiff received a text from Hickey advising Plaintiff that the Defendants had terminated Suljic.  The text surprised Plaintiff.  As Suljic's supervisor, Plaintiff was never consulted regarding the decision to terminate Suljic, or the rationale for making such a decision. Typically, termination of a probationary employee would occur during their probationary employment, not after their probation ended. Termination typically indicated either an act of insubordination, misconduct or a grossly poor performing probationary employee.  Typically when one would finish their probationary status, they would either be offered full time permanent Merit System employment or notified that they were not being hired and that their probationary status had ended.  There would not be a "discharge" at that point.  Defendants lacked any legitimate non-discriminatory reason to have either "discharged" Ms. Suljic or to have denied to her permanent status of a full time Merit position, here Investigator II.  Based upon the combination of Kevin Moore's poor performance that warranted a discharge or at least a PIP and as compared to Suljic's superior performance, it was clear that the only motivating factor behind Suljic's discharge and being denied employment as an Investigator II,  was her sex, being female and to retaliate against her boss, the Plaintiff.

63.   On May 11, 2018, Plaintiff was called to a meeting regarding "Personnel Concerns" by Hickey and Williams.  When, during the meeting, Plaintiff objected to the firing of Suljic without being consulted, Williams replied, "She resigned.  She wasn't fired. I have a letter that says she resigned."  Plaintiff challenged Williams.  Specifically Williams did not possess a letter of resignation rather a letter was placed in Suljic's file, confirming

that she had not resigned but was in fact terminated. Plaintiffs' Superior, Williams directly lied and fabricated information supplied to the Plaintiff.

64. Williams' attitude and demeanor during the meeting was loud, aggressive, and abusive. Williams even gloated that she had gone over Plaintiff's head to "terminate" Suljic and specifically ignored Plaintiff. Williams apparently did not realize the contradiction of her earlier statement that Suljic had resigned. Williams went on to strongly suggest that Plaintiff was favoring Suljic over Moore and stated that she believed that because "you and Suljic are friends." Williams intimated to Plaintiff that she had knowledge that Plaintiff was acquainted with and knew Suljic before Suljic was hired. Such a statement was also false and fabricated by Williams. Plaintiff did not know Suljic prior to Suljic coming to work for DES. The Defendants' acts created a very hostile and adverse working condition for the Plaintiff, in that:

(1) Williams had blatantly lied to Plaintiff on two separate occasions of fundamental issues about Plaintiffs working conditions and her subordinate employees;

(2) Williams had falsely accused or asserted a relationship between the Plaintiff and Suljic that did not exist;

(3). Despite the fact that Williams, Clark and Hickey knew of the blatant poor performance of Mr. Moore, that warranted his being placed on probation and being given a PIP, if not outright discharged, demonstrated that the Defendants through the acts of Williams, Clark and Hickey were intentionally creating an atmosphere for the Plaintiff that was extremely hostile and adverse to Plaintiffs working conditions and likely was directed in such a fashion to force the Plaintiff to quit her job as a Investigator III. The distinctly disparate treatment as and

between Moore and Suljic was both unjustified but was clearly motivated by Suljic being a female, a violation of §213.055 RSMo. and 42 USC 2000(e) where sex was the motivating factor in the manner in which Suljic was denied employment but also was meant to retaliate against her supervisor, Plaintiff Niekamp, for filing her internal complaint and her 4/25/18 MCHR/EEOC complaint about pay inequity and pay discrimination.

65.     In fact, Williams blatantly lied to Plaintiff because neither she nor anyone else had a legitimate reason to deny Suljic's employment in a merit position.  At the same time, the other Investigator II, Moore, whose performance violated procedures and code of conduct and warranted a PIP and likely a discharge was not in any way disciplined.  Such distinctly disparate treatment of Moore and Suljic was unjustified but was motivated by Suljic's being female.     The Defendants, through these employees, were retaliating against Plaintiff for her complaints of pay inequity and they were trying to send her and other employees a "message".

66.     Throughout all of this time of Defendants retaliating against Plaintiff, they didn't even provide to her a minimal raise similar to all other employees.  Plaintiff continued to receive the same compensation from the time she was hired in the fall of 2015 until her Constructive Discharge of October 31, 2018.

67.     On a later date, Williams claimed to Plaintiff the reason why Suljic was terminated was because it was "easier to get rid of Suljic" because she was a "probationary employee" than it was to deal with Moore.  Had the Defendants approved Plaintiff's submission of the paperwork Plaintiff prepared indicating Suljic had successfully completed her probationary period, Williams' rationale for justifying Suljic's termination would have

been exposed as false, fallacious and contrived by the Defendants because they had no non-discriminatory reason to deny full time permanent Merit employment to Suljic. Suljic's gender of being female was the motivating factor for denying to her full-time employment. Suljic constitutes a "me too" witness and victim same and similar to Plaintiff.

68. Moore, at a minimum, should have been placed on a PIP. Moore had disregarded earlier directives regarding his attitude and performance. Because Moore disregarded those directives almost immediately, he should have been discharged. Plaintiff was never permitted to process the disciplinary action or PIP regarding Moore. Moore was never disciplined. Moore's gender, being male, motivated Defendants to retain Moore despite his poor performance and his direct insubordination and ongoing violations of the Departments Code of Conduct.

**COUNT I –**
**UNEQUAL PAY, 42 USC 2000(e) ET SEQ – BASED UPON SEX OR GENDER DISCRIMINATION**

69. Plaintiff incorporates by this reference paragraphs 1 through 68 above as if more fully set forth herein.

70. The acts of the Defendants, as described above, state a violation of 42 USC 2000(e) Et Seq in that Plaintiff's sex (female) was a motivating factor in the decision by the Defendants to pay Plaintiff substantially less annual compensation than her male predecessor, substantially less than her male counterparts who held the same job position classification, and less than her male subordinates.

71. Defendants knew on the day they hired Plaintiff they were going to intentionally pay her less compensation than her male predecessor, even though she was more qualified and

experienced in the subject matter of the position. Plaintiff's sex, being female, was the motivating factor in such unequal pay.

72. Defendants knew on the day they hired Plaintiff they were going to intentionally pay her less compensation than similarly situated males who held the same job classification as Plaintiff. Plaintiff's sex, being female, was the motivating factor in such unequal pay.

73. Defendants knew on the day they hired Plaintiff they were going to intentionally pay her less compensation than those employees in subordinate positions as Investigator II including at least one employee who was to be supervised by Plaintiff, Mr. Moore. Plaintiff's sex, being female, was the motivating factor in such unequal pay.

74. Plaintiff, as described above, was qualified for her position to perform all of the duties required as an Investigator III in the Division of Employment Security's "Criminal Investigative Unit"; and, had performed those job duties at a high level of quality and productivity.

75. Defendants had no legitimate non-discriminatory reason to pay Plaintiff substantially less annual compensation than her male counter-parts and subordinates; and Defendants cannot articulate any legitimate non-discriminatory reason for the gross disparity in Plaintiff's annual salary. Plaintiffs' sex was the motivating factor in her being paid a lower wage, a distinct pay inequity as compared to male employees.

76. All acts being taken by the Defendants as described above and herein were taken in bad faith by the Defendants and are indicative that Plaintiff's sex, being female, was the motivating factor of Plaintiffs unequal pay and when the Defendants were caught red handed, instead of correcting the wrong, the Defendants retaliated against Plaintiff. Such actions taken against Plaintiff were done knowingly and intentionally. Defendants knew

their sex motivated disparity in Plaintiff's annual compensation violated both Federal and State Anti-Discrimination Statutes. Defendants also knew that such sex-based wage disparity would be injurious to the Plaintiff causing her both economic and non-economic damages. They also knew that retaliation was an illegal act that would or could cause or create a very hostile work condition for the Plaintiff.

77. Because Plaintiff was paid at a lower annual salary than comparable males, she had a corresponding lower contribution to her benefits under MOSERs and Social Security.

78. As a direct and proximate result of the Defendants' acts of paying Plaintiff a lesser annual salary than comparable males, and where Plaintiff's gender was a motivating factor, Plaintiff sustained at least between$15,000.00 to $20,000.00 in lost income and benefits during her employment.

79. Plaintiff is entitled to an award of punitive damages in that Defendants' acts of wage disparity were motivated by Plaintiff's gender and were intentional. When Plaintiff brought a wage disparity complaint to the attention of the Defendants' (EEO) her complaint was ignored and her pay and inequity disparity was intentionally ignored and not addressed. When Plaintiff exercised her right to file an internal complaint with the EEO officer, a written internal complaint regarding the unequal pay as well as her MCHR/EEOC complaint, Defendants acted in total bad faith by retaliating against the Plaintiff and on at least 2 or more occasions directly lied to her about the conditions of her employment or her co-employee subordinate Amira Suljic.

80. Plaintiff is entitled to an award of Post-Judgment interest under the Missouri Post Judgment Interest Statute in the amount of 5% plus the current federal funds rate at the time of Judgment on any Judgment Plaintiff receives.

81.     Plaintiff is also entitled to an award for her attorney fees and costs associated with pursuing her claims and causes in this matter.

82.     Amira Suljic is a "me too" witness and victim like Plaintiff.

**WHEREFORE**, Plaintiff prays for judgment in her favor under Title VII, 42 USC 2000(e) Et Seq and against the Defendants for gender or sex discrimination regarding her compensation and seeks the following relief:

1.     An award of at least $25,000.00 for the lost wages and benefits sustained by Plaintiff from the date she was first employed until she left the employment of the Defendants;

2.     An award of punitive damages due to Defendants' actions being intentional and taken knowing they were violating Plaintiff's rights guaranteed by Title VII 42 USC 2000(e) Et Seq with regard to her compensation; and the Defendants' intentional refusal to take corrective action when Plaintiff presented such discriminatory pay and inequity to the Defendants through their EEO;

3.     Plaintiff be awarded her reasonable attorney fees and costs as is allowed and provided for under 42 USC 2000(e) Et Seq.  Plaintiff prays the court to set a reasonable Lodestar rate and assess an additional multiplier as allowed under both Federal and Missouri law and based upon the facts and circumstances of Plaintiff's claims and the intentional misconduct of Defendants;

4.     Plaintiff prays for an award of her expenses and case costs that were reasonably incurred and necessarily expended to prosecute her claims;

5.  Plaintiff prays for an awarded of post-judgment interest on all judgment amounts as is allowed for under the Missouri Post Judgment Interest Statute in the amount of 5% plus the Federal Funds Rate on the date judgment is entered; and

6.  Plaintiff prays for any/and all other relief awardable to Plaintiff under the facts and law applicable to Plaintiff's claim.

## COUNT II –
## RETALIATION BY DEFENDANTS

83.  Plaintiff incorporates by this reference paragraphs 1-82 as if more fully set forth herein.

84.  After Plaintiff filed her initial internal claim against the Defendants through their EEO, for wage discrimination based on sex, Defendants began a series of intentional and systematic patterns of harassment and retaliation against her which continued until Plaintiff was constructively discharged on Oct. 31, 2018.    The Defendants series of intentional and systematic pattern of harassment and retaliation against Plaintiff increased to a higher level after Plaintiff filed her MCHR/EEOC complaint on 4/25/18.

These acts and series of intentional and systematic patterns of harassment and retaliation included the continual  undermining of her authority to supervise and discipline her subordinates, deny to Plaintiff hiring a needed Investigator II, Suljic, who was and did perform as an excellent employee, and needlessly and without justification change and modify Plaintiff's supervisory and administrative functions.  Specifically:

a.  Defendants refused to allow Plaintiff to perform her job duties in the manner in which she was trained to do, including, but not limited to supervising and evaluating her subordinate employees and intentionally undermined her authority and position as regards the subordinates over whom Plaintiff supervised, including Kevin Moore.  Defendants specifically would not allow placing Mr.

Moore on a PIP and giving him notice of such plan. Moore's conduct and performance had fallen far below the DES Code of Conduct and the job expectations for continued employment. Specifically, Plaintiff was subjected to the misconduct of Moore, by his refusal to train and assist Ms. Suljic, a probationary female employee assigned to the St. Louis field office. Moore specifically indicated to Plaintiff and to Suljic that he did not like working with women and would not train Suljic because she was a woman. Such statement by Moore was direct evidence of his mistreatment of employees and his insubordination of the Plaintiff directly based upon Suljic and Plaintiff being female. As such, the conditions of Plaintiff Suljic and Plaintiff Niekamps' work conditions were made adverse by Moore's discriminatory conduct that was motivated by Suljic's and Plaintiff's sex. When making such request of subordinate Moore that he assist and use his experience and knowledge to train Suljic, Moore was even further insubordinate by stating to his boss, Plaintiff Niekamp, "Train her yourself."

b.      Williams, Hickey, and Clark specifically, with the knowledge of Moore's misconduct and insubordination, refused to allow Plaintiff to issue a PIP or institute any formal disciplinary action against Moore. Further, Williams falsely stated to Plaintiff that the PIP process could not be used on Moore because the process was being modified and changed. Such statement was a blatant lie. The process was not being changed, only the form;

c.      By Defendants' actions of not permitting Plaintiff to discipline Moore, encouraged Moore to continue to be insubordinate and disrespectful to Plaintiff

and abusive to and of Ms. Suljic, making both Plaintiff and Suljics' working conditions hostile and adverse ultimately leading to the conditions that warranted Plaintiffs Constructive Discharge;

d.    It became apparent to Plaintiff and Suljic that the Defendants through the acts of Williams, Clark or Hickey were actively advising Moore that Plaintiff intended to file a PIP Notice with regard to Moore's job performance and that he, Moore, should attempt to create a defense to the impending PIP.  As such, Mr. Moore filed an unsubstantiated false and specious grievance against the Plaintiff.  Such furthered the hostile work and adverse working conditions for Plaintiff;

e.    Defendants failed to approve Plaintiff's notification and recommendation to Defendants that Suljic had successfully and overwhelmingly completed her probationary period at a superior level and was not only eligible but should be promoted into the full-time, permanent merit-based position.  In denying such position to Suljic, the Defendants could not and would not articulate a legitimate non-discriminatory reason for denying employment to Suljic.

f.    After Plaintiff had filed her MCHR/EEOC complaint on 4/25/18, Defendants through the actions of Williams, Clark and Hickey refused to timely approve the "Objectives" plan that had been prepared by Plaintiff for the employees she supervised.  Such failure left Plaintiffs subordinate employees frustrated and confused with regard to what either the Plaintiff or the CIU unit itself, was expecting of them regarding goals and objectives.  This intentional action by the employees Williams, Hickey and Clark created an environment of hostility,

animosity and poor morale, making it extremely difficult for Plaintiff to have the ability to perform her job duties. In fact, nearly made it impossible;

g.   Further and suddenly, after Plaintiff filed her MCHR/EEOC complaint, in an unprecedented fashion and without notice, Defendants' Assistant DES Director Spencer Clark began to micromanage Plaintiff's job duties and responsibilities. For instance, Clark questioned why Plaintiff was scheduling face-to-face interviews, rather than conducting telephone interviews with unemployment beneficiary recipients. Had Clark known, read or referred to the Unit's operating procedure, he would have known that face-to-face interviews were required. Further, Clark required that Plaintiff submit to him, Clark, Plaintiff's schedule for when she and her subordinates were going into the field. Clark, also without warning or justification, imposed the unreasonable and unrealistic requirement that he be given advance knowledge of dates when field work was scheduled. Clark further changed the threshold of the overpayment amount for which the CIU was authorized to conduct interviews and collect overpayments. Clark further conducted supervisory meetings without notifying Plaintiff or including Plaintiff in such meetings. All acts unjustified and intentionally geared and intended to undermine Plaintiff's authority and create an inordinate hostile work environment for the Plaintiff. All done by the Defendants, both in the retaliation against Plaintiff for her earlier complaint internally about inequitable pay but also in retaliation for Plaintiff filing her MCHR complaint of 4/25/18. In all instances, the motivating factor for the adverse treatment and the adverse conditions created by Defendants for Plaintiff was her sex, being a woman.

h.      Clark refused and failed to respond to Plaintiff's emails requesting information regarding the status of various projects, and otherwise leaving Plaintiff in the dark, without the necessary critical and/or even practical information that Plaintiff needed to perform her job duties.  All acts clearly being done by Clark for the purposes of intimidating, retaliating and creating a hostile work environment for the Plaintiff.  So hostile and so adverse that it would force her to quit her job.

85.     Defendants progressively, from the time Plaintiff filed her initial internal complaint regarding wage disparity, and certainly after she filed her MCHR/EEOC complaint on 4/25/18, continually undermined her authority and retaliated against her by taking actions that made her work under adverse working conditions, not the least of which were Defendants' action of protecting an insubordinate, incompetent, lazy and non-performing employee, Moore, while at the same time going over Plaintiff's head and discharging Suljic, a highly performing, energetic and highly competent employee.  All such actions of Defendants led to create a hostile work atmosphere ultimately resulting in Plaintiff's constructive discharge.

86.     Any reasonable person would have found the acts of Defendants towards Plaintiff, including; (a) pay inequity; (b) failure of Defendants to address the pay inequity when Plaintiff presented her EEO complaint; (c) the acts taken by Defendants after Plaintiffs internal complaint of pay inequity, including taking no action or even acknowledging at least the appearance of inequity; (d) the overreaching actions of undermining Plaintiffs authority with regard to the disciplining of Kevin Moore; (e) the sudden micromanaging by Clark of the Plaintiff as she attempted to perform her job duties; (f) the unexplained failure to approve Plaintiff's report that Suljic had successfully completed her

probationary period. Thus entitling Suljic to being hired as a full time Merit based employee; (g) terminating Suljic without advising Plaintiff, or seeking her opinions, prior to the Defendants discharging Suljic; (h) the repeated lying of Williams regarding why Suljic was discharged as well as lying about documentation regarding the discharge of Suljic, and lying about the reasons why Moore could not be placed on a PIP; (i) Williams' belligerent, loud, disrespectful and threatening response to Plaintiff regarding Suljic's discharge and inviting Plaintiff to file a grievance against Williams and affirmatively indicating that such complaint would fall on deaf ears; and (j) Clark's micromanagement which included the manipulation of the "goals and objectives" of the Unit which resulted in creating frustration and confusion amongst Plaintiff's subordinates, all so unreasonable and creating such a hostile work environment that was intolerable justifying Plaintiff to submit her constructive discharge resignation on October 31, 2018. Such constructive discharge was motivated by Plaintiff's sex, being female.

87. The actions of the Defendants were all motivated by Plaintiffs gender and were intentional. The pay inequity was gender based, the ignoring of Plaintiffs' internal grievance was gender based, the retaliation by the Defendants for bringing the internal grievance and the MCHR/EEOC complaint for Plaintiffs' pay inequity being based upon her sex were both intentional and gender based.

88. As a direct and proximate result of the Defendants actions described above, that were motivated by Plaintiffs sex as described above, have resulted in the following damages:

(1) Plaintiff has sustained at least $25,000.00 in pay inequity from the time she began her job until she quit on October 31, 2018.

(2)    Plaintiff has sustained the emotional damages of being subjected and having to work within a hostile work environment all of a value of at least $25,000.00;

(3)    Plaintiff has been constructively discharged from a position that she was being paid in excess of $40,000.00 and a position in which, she at a minimum, should have begun at a salary of $45,000.00 a year. Plaintiffs total compensation package for a given year at the time of her constructive discharge would have been of a value of least between $52,000.00 to $55,000.00 when considering all of the fringe benefits particularly of a MOSERs retirement and Defendants contribution to Plaintiffs Social Security and Medicare as well as other employee benefits like annual leave and sick leave. As such with Plaintiff, at the age of 44 at the time of her constructive discharge on October 31, 2018, she would have had at least 22 years of remaining employment to age 66 and 26 years of employment to age 70. With a fixed and stagnant annual compensation package of $52,000.00/year to $55,000.00/year, Plaintiff has sustained between $1,100,000.00 in lost income (for the remaining 22 years) up to $1,400,000.00 had she continued to work to the age of 70.

89.    Because of the intentional act in paying Plaintiff a lesser salary than comparable males and their actions being motivated by Plaintiffs sex, being female, and because the Defendants intentionally retaliated against the Plaintiff for both filing an internal grievance regarding her salary inequity and for filing a MCHR/EEOC complaint and by the Defendants' acts of intentionally creating a further hostile and adverse working condition for Plaintiff resulting in her Constructive Discharge, Plaintiff is entitled to an additional award of Punitive Damages against each of the Defendants for their acts of

Discrimination, motivated by Plaintiffs sex and for their retaliation against the Plaintiff for pursuing both her internal complaint, her MCHR/EEOC complaint and for her association with "Me Too" co-employee Amira Suljic.

90.    Plaintiff, for her claims under Count II based on Title VII 42 USC 2000(e) Et Seq is further entitled to an award of reasonable Attorney fees and award for her necessary costs in prosecuting this claim.

91.    Plaintiff is entitled to an award for Post-Judgment interest on all Judgment amounts in the amount of 5% plus the Federal Funds rate on the date of Judgment per annum.

**WHEREFORE,** Plaintiff prays for Judgment in her favor on Count II and prays that the Court award to her:

(1)    The sum of at least $25,000.00 for the lost income for the time of Plaintiffs employment due to her inequitable pay motivated by her being a woman.

(2)    Plaintiff be awarded at least $25,000.00 for mental anxiety and anguish sustained an created by the acts of the Defendants that created a hostile and adverse working condition.

(3)    A sum of at least $1,100,000.00 of lost income from October 31, 2018 until Plaintiff reaches the age of 66 constituting the lost income at the rate of an annual compensation package of $65,000.00/year for each of those years Plaintiff would have been employed after October 31, 2018 until her 66th birthday.

(4.)    Plaintiff further prays for an award of Punitive Damages against each Defendant for their intentional conduct of:

(a) pay inequity;

(b) refusing to take action when Plaintiff filed a grievance with regard to pay inequity;

(c) for the intentional acts of retaliating against Plaintiff for exercising her right to file an internal grievance for pay inequity and for filing a MCHR/EEOC complaint with regard to pay inequity based upon her sex;

(d) the intentional acts of the Defendants that were not only retaliatory against the Plaintiff but created a substantial degree of certain harm and injury to her because of the retaliations that caused Plaintiff to submit her Constructive Discharge.

(5)     Plaintiff further prays for an award of Attorney fees in favor of the Plaintiff and that the Court assesses reasonable attorney fees for those hours that the Court believes were reasonably expended in pursuing and successfully obtaining a Judgment on behalf of the Plaintiff. Included in such award should be the setting of a reasonable hourly Lodestar rate, multiplied by reasonably multiplier of between 1.25 and 1.50, in light of the facts and circumstances of the discrimination against the Plaintiff and the intentional acts of the Defendants and the circumstances of this specific litigation. Plaintiffs suggest a Lodestar of at least $425/hr.

(6)     Plaintiff further prays for an award of Post-Judgment Interest awardable under the Missouri Post-Judgment Interest Statute and that such interest should be assessed by the Court on all Judgment amounts including a Judgment for attorney fees and cost, in the amount of 5% plus the Federal Funds rate on the date of Judgment, per annum; and

(7)    Plaintiff further prays for any/all other relief including any other recoverable damages or awards that would be supported by the facts of this case, the circumstances of this case and as are otherwise available to the Plaintiff under Missouri law.

## COUNT III –
**ASSOCIATIONAL DISCRIMINATION – TITLE VII 42 USC 2000(e) (5)(F) 1 ET SEQ**

92.    Plaintiff incorporates by this reference paragraphs 1-91 above as if more fully stated out in full herein.

93.    Amira Suljic was an exceptional employee hired in the position of Investigator II.

94.    Suljic at all times performed her job duties at a very high level of performance. She was never disciplined and never performed at a poor level.

95.    Suljic should have been promoted into a full-time permanent merit position of Investigator II. Defendants had no legitimate non-discriminatory reason for denying to Suljic her full-time merit position. In fact, Suljic, contrary to Missouri Merit System law, was improperly discharged at the end of her probation period. When in fact the Missouri Merit System Statute and Regulations would not provide for such a discharge. Such action of discharging Suljic was motivated by her gender, being female. Similarly, all of the actions described herein of a discriminatory nature taken against the Plaintiff, likewise was motivated by Plaintiffs sex, being female.

96.    Because Suljic was a woman, Defendants subjected her to discriminatory conduct in the workplace by co-employee, Kevin Moore. Specifically Moore: (a) refused to train Suljic; (b) refused to work with her; (c) told Suljic he didn't like working with her because she was a woman (d) told Suljic he didn't think women should supervise men, (e) told Suljic he preferred working with a male; (f) questioned the manner in which she followed

procedure, telling Suljic that she didn't know what she was doing; (g) undermined his immediate supervisor, Plaintiff, by informing Suljic that Plaintiff had trained Suljic in a manner that Moore disagreed with and that specifically Plaintiff did not know what she was doing; (h) Moore went over Plaintiffs head and contacted Plaintiffs superior Hickey, a male, complaining about both Plaintiff and Suljic; (i) denied to Suljic access and ability to use the Division automobile; (j) refused to clean the interior of the Division automobile and intentionally trashed and left it in an unsanitary and filthy condition knowing that his failure to clean the vehicle would not only upset Suljic but would cause her to either have to use such filthy vehicle or refuse to use the fleet vehicle;(k) took pictures of the trashed vehicle and placed such offensive photographs at his work station in the plain sight of Suljic knowing that she would see them and become upset by them. All such acts of Moore, taken against both Suljic and Plaintiff, were motivated because both Suljic and Plaintiff were women. As such, sex was the motivating factor in his actions that created for both Suljic and Plaintiff a hostile and adverse working condition.

97. Suljic reported to Plaintiff that Moore was overly aggressive in his interviewing of recipients, and in some incidents violated a recipient's civil rights; including an incident when, in the field, as a team, Moore and Suljic stood at the front door of a recipient's residence and when the recipient answered the door and told Moore that he didn't want them inside. Moore forced his way into the recipient's house. Suljic refused to enter and stayed on the front porch of the residence. Later, Moore told Suljic if she had been a male, the male would have entered the home with Moore. Moore then informed Suljic that the way he had handled the entry and conduct toward this individual was the way he handled all incidents. He went on to say that that was the reason he wanted a male

partner, informing Suljic that for those reasons and others she should not have been hired for the position. All specifically because she is a woman.

98. Suljic reported the conduct described above of Moore to her immediate supervisor, the Plaintiff. Because Plaintiff had then been advised of distinct and overt sex discrimination and the creation of both a hostile work environment for Suljic and likely a criminal act being committed by Moore against a recipient, Plaintiff was mandated to report this to Williams and Hickey, her supervisors. After reporting Moore's conduct to Williams and Hickey, Moore was never disciplined for either his violation of the Civil Rights of the recipient or his discriminatory acts and hostile environment created toward and for Suljic. After Moore knew that Suljic had reported the incident, Moore's harassment and hostile conduct toward Suljic became more pointed and intense. As such, Ms. Suljic was subjected to an ever increasing adverse and hostile work condition motivated by her sex.

99. Such conduct of Moore created a hostile work environment for Suljic because she was and is a female. Such action of Moore violated numerous internal policies of Defendants as well as various state and federal anti-discrimination laws. Moore had been trained by the Defrendants with regard to these policies and laws.

100. Plaintiff, as the supervisor of Moore and Suljic, attempted to take corrective and disciplinary actions regarding Moore's conduct and address the hostile work environment in which Suljic was working.

101. However, Plaintiff was met with resistance from Defendants through their employees, Williams, Hickey and Clark. Specifically, Defendants failed: (a) to take adequate action toward Moore's discriminatory conduct including disciplining him, retraining him and placing him on probation; (b) failed to follow Plaintiff's recommendations that Moore be

written up and placed on a PIP and, by their failure to act, undermined Plaintiff's authority which allowed Moore to continue to harass and demean Suljic creating an ever increasing hostile and adverse working environment for Suljic; and, (c) creating a conflict between employees, Suljic and Moore, that resulted in and led to the Defendants firing of Suljic, even after the above described conduct of Moore was reported and known to Defendants employees Clark, Williams and Hickey but also after Plaintiff had recommended Suljic to be hired in a permanent Merit system position as Investigator II. The Defendants, in firing Suljic, had no legitimate non-discriminatory reason for discharging her from her probationary position and the Defendants did not have any legitimate non-discriminatory reason for not offering employment to Suljic in a full-time Merit system position as an Investigator II.

102. In part because of Defendants' conduct toward Suljic, Plaintiff filed an Amended MCHR Complaint with regard to Defendants' conduct toward Suljic, a female, and the unjustified favorable treatment of Moore, a male. Such conduct of the Defendants was overwhelmingly motivated by Suljic's and Plaintiff's gender, being female.

103. Defendants' conduct of retaliation against Plaintiff and Suljic was motivated by Plaintiff's association with Suljic. The adverse working conditions created by Defendants for boh Suljic and Plaintiff were motivated by both being female.

104. Defendants conduct, as described herein against Suljic, violated Title VII 42 USC 2000(e) Et Seq. Such actions also violated internal Rules and Regulations of the Defendants including their Code of Conduct. All mandatorily required the Plaintiff to report Moore's actions to the Defendants and in particular to Defendants Williams, Hickey and Clark. Similarly the actions of Moore in violating the above Rights of Suljic

protected by the above cited statutes but also violated the rights of Plaintiff in that she as Ms. Suljic's supervisor was in a position of association with Suljic and was aware of the acts of the Defendant Moore in violating Suljics' rights to not be discriminated against in the terms and conditions of her employment based upon her sex or gender as protected under both State and Federal Statutes.

105. On multiple occasions, as Suljic's supervisor, Plaintiff attempted to address and respond to Suljic's complaints of adverse working conditions including, but not limited to: (a) informing supervisors Williams, Hickey and Clark of Moore's acts described herein against Suljic and the need for remedial action; (b) after three supervisors agreed that Moore should be given a PIP, Plaintiff prepared such a PIP and a Notice of Job Action against Mr. Moore; and (c) throughout her employment as Mr. Moore's supervisor, Plaintiff continually attempted to educate and discipline Mr. Moore as to his wrongful conduct and to try to persuade him to act in accordance with the law and the Code of Conduct of the Department of Labor.

The result of Plaintiffs association with Suljic as her supervisor and attempting to address the serious concerns brought to Plaintiff's attention by Suljic and specifically Ms. Suljic's adverse working conditions and hostile working conditions that Suljic was placed under by Moore's conduct and the Defendants failure to remedy Moore's conduct, Plaintiff was then faced with retaliation and her own additional adverse and hostile working conditions from that association with Ms. Suljic. The Defendants by their actions of retaliation denied to Plaintiff her ability to perform her job duties. Specifically, Defendants, after agreeing that a PIP should be issued to Mr. Moore, suddenly and without any rational and truthful explanation, informed Plaintiff to "hold back" the PIP

on Moore. Plaintiff was then directly lied to by Ms. Williams who indicated that they would have to "hold back" the PIP on Mr. Moore because the PIP process was being changed. A complete falsehood and fabrication.

106. Plaintiff was then confronted with the Defendants arbitrarily deciding to discharge Suljic and then lying to the Plaintiff informing her that Ms. Suljic had resigned when in fact she had been discharged. All of this creating an extremely intense and hostile work environment for the Plaintiff and Ms. Suljic.

107. Finally as described above, Plaintiff was then subjected to the ongoing repeated and unjustified conduct of Mr. Clark interfering with her responsibilities as a supervisor, second guessing her decision making and undermining the actions that she took culminating in the ultimate interference in the creation of and usage of the objectives and goals as described above. All resulting in such a hostile work environment and blatant retaliation being taken against the Plaintiff for doing her job, particularly her job with regard to the conflicts that were created by Moore and the hostile work environment he created for "Me Too" employee, Amira Suljic. Because of the Defendants actions, the retaliations, the intentional interference with her doing her job and her association with "Me Too" employee Amira Suljic, Plaintiff submitted her Constructive Discharge resignation on October 31, 2018.

108. Defendants' acts, including those of Williams, Clark and Hickey, violated 42 USC 2000(e) Et. S in that they "aided and abetted" Moore's discriminatory conduct against Suljic. Conduct that was based upon Suljic being a woman, and Defendants acts committed by Williams, Clark and Hickey "aiding and abetting" Mr. Moore's deliberate,

discriminatory conduct based upon Suljics sex, being a female, encouraged, facilitated and furthered Moore's ongoing and ever increasing discriminatory conduct toward Suljic.

109. The Defendants further actions taken by Williams, Clark and Hickey were taken in obvious retaliation for Plaintiffs association with Ms. Suljic, as her supervisor and thereby those acts of Williams, Clark and Hickey violated 42 USC 2000(e) Et. Seq. resulting in the creation of a further adverse and hostile work environment for the Plaintiff and Suljic, resulted in Suljic's discharge and the Defendants' lying to the Plaintiff about why Suljic was discharged all contributed to a work condition that required Plaintiff to submit her Constructive Discharge resignation of October 31, 2018.

110. As a direct and proximate result of Plaintiff having and being forced to submit her constructive discharge resignation, Plaintiff has lost the income that she was due from her position at a value of at least $50,000.00/year measured through the rest of her working life to the age of 66 and 70. Such damages include lost income from the date of her Constructive Discharge to the date of filing, equal to approximately $65,000.00 as well as the lost income and benefits she would have been paid had she continued in her position until the age of 66 and likely to the age of 70.

111. Defendants' acts as described within this Petition and in particular within this Count III were intentional. They were intentional in that the Defendants, through the acts of Clark, Williams and Hickey created such a work atmosphere that was so adverse and hostile that it forced the Plaintiff to quit. Defendants actions also were intentional in ignoring Plaintiffs complaints of unequal pay but resulting in their retaliatory actions against the Plaintiff that not only created a hostile work environment for the Plaintiff but for

employee Suljic as well. Such intentional acts of the Defendants warrant the award of Punitive Damages.

112. Plaintiff is entitled to an Award of Attorney Fees at a reasonable hourly rate as well as her costs in pursuing this Cause of Action.

113. Plaintiff is entitled to Post-Judgment interest on all Judgments including Judgments for attorney fees and costs in the amount of 5% plus the Federal Funds rate at the time Judgment is entered per annum.

**WHEREFORE,** Plaintiff prays for Judgment in her favor on Count III and prays that the Court award to her:

(1) The sum of at least $25,000.00 for the lost income for the time of Plaintiffs employment due her inequitable pay motivated by her being a woman.

(2) Plaintiff be awarded at least $25,000.00 for mental anxiety and anguish created and sustained by the acts of the Defendants that created a hostile and adverse working condition.

(3) A sum of at least $1,100,000.00 of lost income from October 31, 2018 until Plaintiff reaches the age of 66 constituting the lost income at the rate of an annual compensation package of $65,000.00/year for each of those years Plaintiff would have been employed after October 31, 2018 until her 66th birthday.

(4.) Plaintiff further prays for an award of Punitive Damages against each Defendant for their intentional conduct of:

(a) pay inequity;

(b) refusing to take action when Plaintiff filed a grievance with regard to pay inequity;

(c) for the intentional acts of retaliating against Plaintiff for her right to file an internal grievance for pay inequity and for filing her MCHR/EEOC complaint;

(d) the intentional acts of the Defendants that were not only retaliatory against the Plaintiff but created a substantial degree of certain harm and injury to her because of the retaliations Plaintiff's working conditions were so intolerable she was subjected to a Constructive Discharge.

(5)     Plaintiff further prays for an award of Attorney fees in favor of the Plaintiff and that the Court assesses reasonable attorney fees for those hours that the Court believes were reasonably expended in pursuing and successfully obtaining a Judgment on behalf of the Plaintiff.  Included in such award should be the setting of a reasonable hourly Lodestar rate, multiplied by reasonably multiplier of between 1.25 and 1.50, in light of the facts and circumstances of the discrimination against the Plaintiff and the intentional acts of the Defendants and the circumstances of this specific litigation.

(6)     Plaintiff further prays for an award of Post-Judgment Interest awardable under the Missouri Post-Judgment Interest Statute and that such interest should be assessed by the Court on all Judgment amounts including a Judgment for attorney fees and cost, in the amount of 5% plus the Federal Funds rate on the date of Judgment, per annum; and

(7)     Plaintiff further prays for any/all other relief including any other recoverable damages or awards that would be supported by the facts of this case, the circumstances of this case and as are otherwise available to the Plaintiff under Missouri law.

Respectfully submitted:

By:  Roger G. Brown

Roger G. Brown & Associates
216 E. McCarty St
Jefferson City MO 65101
573-634-8501
jclaw@rogerbrownlaw.com

/s/William C. Hopkins
Hopkins Legal Services
9233 Ward Parkway, Suite 270
Kansas City, MO 64114

william@whopkinslegalservices.com

**Attorneys for Plaintiff**